UNITED STATES of America,
Plaintiff–Appellee,

v.

James Patrick GOGGIN and William Ir-
win Delp, Jr., Defendants–Appellants.

No. 87–5559
Non–Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

Aug. 29, 1988.

Dennis J. Cary, Ft. Lauderdale, Fla., for defendants-appellants.

Dexter W. Lehtinen, U.S. Atty., Allan J. Sullivan, Linda Collins Hertz, Harriett R. Galvin, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before TJOFLAT, HILL and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

James Goggin and William Delp were both convicted of one count of importing cocaine into the United States, in violation of 21 U.S.C. § 952(a), one count of conspiracy to import cocaine, in violation of 21 U.S.C. § 963, one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and one count of conspiracy to possess cocaine, in violation of 21 U.S.C. § 846. Goggin and Delp now appeal their convictions for importation and conspiracy to import. They argue that the evidence was insufficient to support the convictions and that an erroneous charge to the jury on the element of importation requires reversal. We affirm.

## I.

At approximately 9:45 A.M. on August 17, 1986, Louis Garland, a United States Customs Service pilot operating a twin-engine jet with sophisticated radar equipment, learned from radar operators in Miami that an unidentified airplane had been tracked flying ten miles north of Bimini, an island in the Commonwealth of the Bahamas. Garland located the airplane on radar and then visually observed the plane northwest of Bimini. He identified the plane as a Piper Navajo aircraft modified to increase speed and proficiency in flying. Garland flew his jet underneath the Piper Navajo and discerned the Piper Navajo's tail number, N374UM, which would be unique to that aircraft. Garland continu-

ously tracked the Piper Navajo by radar as it crossed the United States coastline twenty miles south of Palm Beach, Florida and advanced to a remote point twenty-two miles southwest of West Palm Beach airport. Garland momentarily lost radar contact with the Piper Navajo as it made a 360–degree turn, but he soon reacquired contact and tracked the airplane as it headed towards an airfield at Okeechobee, Florida.

Meanwhile, agents of the Drug Enforcement Administration, the Customs Service, and the Palm Beach County Sheriff's Office were conducting surveillance from a wooded area adjacent to a field in western Palm Beach County. DEA Agent Mark Minelli observed two males drive onto the field. A half hour after their arrival, Minelli saw an airplane with tail number 374UM fly over the field and circle around. Minelli watched as fifteen canvas bags fell, in two drops, from a door at the rear of the airplane. Only two bags fell on the field; the other thirteen landed in an inaccessible marsh. One of the two men collected the two bags from the field and started to drive away. Government agents then arrested both men. The government later ascertained that the fifteen canvas bags contained approximately 452 kilograms of 91 to 93 percent pure cocaine.

Garland alerted the crew of a Customs Service helicopter that the suspect Piper Navajo was flying towards Okeechobee. The pilot of the helicopter saw the Piper Navajo fly past Okeechobee airport, turn around, and land at the airport. The helicopter also landed, and federal agents arrested two men as they exited the Piper Navajo. These two men were later identified as appellants Goggin and Delp.

## II.

We address first appellants' contention that there was insufficient evidence to support their convictions for importation and conspiracy to import. We review the evidence in the light most favorable to the government, and we may reverse only if no reasonable trier of fact could have found

the appellants guilty beyond a reasonable doubt. *United States v. Montes–Cardenas*, 746 F.2d 771, 778 (11th Cir.1984).

21 U.S.C. § 952(a) provides:

It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter....[1]

As a preliminary matter, we note that the government need not demonstrate a specific point on foreign soil from which the cocaine originated to establish a violation of section 952(a). "The fact of crossing the boundary of the United States with contraband suffices to establish importation." *United States v. Lueck*, 678 F.2d 895, 905 (11th Cir.1982). The government may prove that a defendant imported cocaine into the United States "from any place outside thereof" by showing that the defendant brought cocaine into the country from international waters or from airspace in excess of twelve geographical miles outward from the coastline. *See id.*

Appellants argue that the government did not show that they brought cocaine into the country from airspace twelve miles out from the Florida coastline. In particular, they challenge the government's reliance on Garland's testimony. During its case in chief, the government asked Garland to supplement his narrative account of tracking the Piper Navajo by making cross marks on a large aeronautical chart depicting parts of Florida and the Bahamas. Garland indicated two marks on the chart corresponding to the points where he and the Miami radar operators first observed the Piper Navajo. The prosecutor then asked, "The two 'X's', though, that you have indicated here, are they beyond three

miles from the United States coastline?" Garland replied, "I would say it is approximately 25 to 30 miles northwest of Bimini Island." Appellants contend that this exchange demonstrated only that the plane entered the United States from outside the three-mile territorial zone of the United States, not from outside the twelve-mile contiguous zone over which the United States exercises customs authority and which is included in the meaning of "the United States" in 21 U.S.C. § 952(a). *See United States v. Williams*, 617 F.2d 1063, 1073 n. 6 (5th Cir.1980) (en banc).[2]

We disagree. The prosecutor's question to Garland about the territorial limits of American jurisdiction over airspace and waters was, admittedly, imprecise. However, the prosecutor also asked Garland if there was a line on the aeronautical chart indicative of American airspace. Garland pointed to an air defense line, which, he stated, was fifteen miles offshore. The jury could see, from the chart, that the cross marks near Bimini where Garland first observed the Piper Navajo were well outside this fifteen-mile line and, by inference, outside the twelve-mile zone as well.[3]

Appellants also rely on *United States v. Maslanka*, 501 F.2d 208 (5th Cir.1974), *cert. denied on other grounds sub nom. Knight v. United States*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 77 (1975), and *United States v. Carrion*, 457 F.2d 200 (9th Cir.1972). We find those cases readily distinguishable. In *Maslanka*, the government introduced evidence tending to show that a large quantity of marijuana had been imported into the United States from Jamaica; the marijuana had been found wrapped in Jamaican packing materials. The government also showed that Maslanka had been in Jamaica one month before the discovery of the marijuana, but it failed to show that Maslanka had purchased the marijuana in Jamaica. Nor indeed did the

---

1. Cocaine is listed in schedule II of subchapter I of title 21, chapter 13. *See* 21 U.S.C. § 812(c).

2. The *Eleventh Circuit, in the en banc decision Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

3. The record indicates that the aeronautical chart was placed on an easel during the testimony and was admitted as demonstrative evidence as Government's Exhibit No. 12.

government show that anyone in particular transported the marijuana into the United States from outside the country. The marijuana had been brought to the point of seizure on a barge owned by one Capo, but there was no evidence indicating that Capo's barge had left the twelve-mile zone or had rendezvoused with any other boat which had done so. Similarly, in *Carrion*, the government failed to prove that the defendants had brought the seized marijuana from outside the United States. In *Carrion*, the government received a tip that the defendants would be transporting marijuana by airplane from Mexico to an airport in the Los Angeles area. An airplane indeed arrived in Los Angeles carrying marijuana, and the defendants indeed were aboard, but the government had no evidence indicating the origin of the flight. The Ninth Circuit held that one defendant's possession of a map of Mexico (along with other maps) and a matchbook bearing an advertisement for a Mexican motel was insufficient to establish beyond a reasonable doubt that the particular flight bringing marijuana to Los Angeles had originated in Mexico.

In this case, by contrast, the government established that the aircraft dropping the cocaine entered from outside the United States and that the defendants were on that aircraft. Garland first observed the aircraft well outside the twelve-mile zone, and he noted the Piper Navajo's tail number. He tracked the Piper Navajo as it crossed into the United States and headed towards the drop-off point. Although he briefly lost the Piper Navajo on his radar screen, he attributed that to a circular maneuver by the airplane. This explanation was fortified by Minelli, who saw the same airplane circle around the field where the cocaine was dropped. Minelli also saw the cocaine fall from that airplane. Finally, agents in the Customs Service helicopter saw the same airplane land at Okeechobee airport and observed the defendants emerge from the airplane. Government

witnesses thus accounted for the Piper Navajo's movements from the moment that it was sighted near Bimini to the moment that it landed at Okeechobee. This testimony was more than sufficient to establish that Goggin and Delp had imported the cocaine from outside the United States, and that they had conspired to do so.

Delp took the stand and offered a completely different account of his movements. According to Delp, he and Goggin had flown together two days earlier on a commercial airline flight from West Palm Beach to Atlanta. The two men spent one night at a Sheraton Hotel in Atlanta and one night at Delp's brother-in-law's residence outside of Atlanta. They then chartered the Piper Navajo and flew from an airport near Atlanta directly south, over Orlando, to Okeechobee, where they landed and were arrested by government agents.

■ Delp's story was corroborated by the testimony of his brother-in-law, Rick Hudson. However, the existence of a second plausible explanation for the defendants' actions, entirely consistent with innocence, does not diminish the sufficiency of the government's case. Presented with two narratives, one tending to establish the defendants' guilt and another tending to establish their innocence, the jury was entitled to choose the account offered by the government. Moreover, "[w]hen a defendant takes the stand in a criminal case, he subjects himself to a determination by the jury of his credibility. The jury is free to disbelieve him and reject his explanation as complete fabrication. Apparently the jury did exactly that." *United States v. Cotton*, 770 F.2d 940, 945 (11th Cir.1985).

### III.

Appellants next contend that their convictions should be reversed because the trial court assertedly instructed the jury improperly on the element of importation in 21 U.S.C. § 952(a).[4] In particular, they in-

---

4. The trial court instructed as follows:

Before a defendant could be found guilty of this crime of importation of cocaine, the fol-

lowing facts must be established beyond a reasonable doubt.

Number one, that the defendant imported cocaine into the United States from a place

sist that the trial court failed to explain the meaning of a "place outside the United States" and did not inform the jury that this phrase could include only such waters and airspace as are outside the twelve-mile zone. The trial court thus left the jury to speculate on the import of that phrase; the jury could have believed, for example, that the phrase comprehended airspace more than zero miles but less than twelve miles east of the Florida coast.

■ The importation of illicit drugs from a place *outside* the United States is indeed an essential element of the offense prohibited by section 952(a). *United States v. Lueck*, 678 F.2d at 904. Appellants made no objection to the trial court's instruction on this element, however, and proffered no instruction of their own. Accordingly, our review of the court's instruction is strictly limited to the standard of plain error. We must view the charge in its entirety and in the context of the entire trial, and we may set aside the conviction only if the charge was so clearly erroneous as to result in a grave miscarriage of justice or if it seriously affected the fairness, integrity, or public reputation of the trial. *United States v. Fuentes–Coba*, 738 F.2d 1191, 1196 (11th Cir.1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1186, 84 L.Ed.2d 333 (1985).

■ The government strenuously maintains that the district court's instruction was not erroneous at all, as the district court simply combined the Eleventh Circuit Pattern Jury Instruction on 21 U.S.C. § 952(a) with the statutory definition of the term "United States," 21 U.S.C. § 802(28).[5] We note, however, that appellants' disagreement, closely analyzed, is not with the district court's definition of the term "United States," but rather with its lack of explanation of the term "outside." Assuming *arguendo* that the district court's instruc-

tion on the term "outside" was incomplete, the error, if any occurred, was not "plain."

The district court's instruction did not prejudice appellants to the extent necessary to establish plain error; indeed we are not convinced that the instruction contributed at all to the outcome of the trial. Here, "no *erroneous* instruction was given; [the] claim of prejudice is based on the failure to give any explanation—beyond the reading of the statutory language itself—of the ... element. An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977) (emphasis added).

Even if the jury understood the court's instruction as meaning that appellants could be convicted if they brought cocaine into the country from any point within twelve miles east of the Florida coastline, no miscarriage of justice would have resulted. There was no evidence to support a conviction on such a theory. As explained above, the government's case demonstrated that the Piper Navajo entered the country from the vicinity of Bimini, well outside the twelve-mile zone. Appellants did not claim that they flew into the airspace over Florida from a point *within* twelve miles offshore. Rather, Delp contended that he and Goggin flew from Atlanta *over land* south via Orlando to Okeechobee. If the jury had believed Delp's testimony, they would not have convicted appellants of importation, for no rational jury could have concluded, even under the instructions provided by the trial court, that such a flight was importation "from any place outside the United States." There was no evidence at all establishing that appellants brought cocaine into the country from a point within, and not more than, twelve miles from the coast. We therefore conclude that the trial

outside thereof, as charged in Count II of the Indictment.

And, number *two*, the defendant did so knowingly and willfully,

Now, to import a substance means to bring or transport that substance into the United States from someplace outside of the United States. And the term United States, as used in this statute, means the geographical sense of

the United States, and means all places and waters, Continental or insular, subject to the jurisdiction of the United States.

5. "The term 'United States', when used in a geographic sense, means all places and waters, continental or insular, subject to the jurisdiction of the United States." 21 U.S.C. § 802(28).

court's instruction did not result in a miscarriage of justice.

Accordingly, the judgments of conviction are AFFIRMED.