UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven ALLISON, Anthinino Galloway,
Defendants–Appellants.

No. 88–4040.

United States Court of Appeals,
Eleventh Circuit.

Aug. 17, 1990.

Ellis S. Rubin, Atty. Gen., A. Hinda Klein, Rubin, Rubin & Fuqua, P.A., Miami, Fla., Stanley P. Klein, State's Atty., Klein & Greenspun, Fairfax, Va., for defendants-appellants.

Ronald Hayward, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before HATCHETT and
EDMONDSON, Circuit Judges, and
BRIGHT *, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Defendants Allison and Galloway appeal their conviction for conspiracy to possess with intent to distribute cocaine and for aiding and abetting each other in the attempt to possess cocaine. Allison and Galloway, along with Donald Ervin and Michael Campbell, decided to purchase cocaine in Miami and to transport it to Washington, D.C. One of Allison's friends, Laboya Wicker, agreed to contact her sources in Miami to get the drugs. The conspirators flew to Miami for the deal. After learning that Wicker might be a Drug Enforcement Administration ("DEA") agent, the conspirators arranged to get the cocaine in Orlando from sources known to another of Allison's friends, Walter Johnson. Johnson's source in Orlando turned out to be a DEA agent.

After their arrests, Campbell and Johnson pleaded guilty to conspiracy and agreed to testify against the others. Ervin was never apprehended. Allison and Galloway were tried jointly and convicted. On appeal, Galloway claims that he was convicted on the basis of inadmissible co-conspirator hearsay testimony and that, even if the testimony was admissible, the evidence presented was insufficient to sustain his conviction. Allison challenges his conviction for insufficiency of the evidence and for discriminatory use of peremptory challenges to strike black jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Galloway raises no *Batson* claim.

### 1. *Co-conspirator Testimony*

At trial, Galloway made a continuing objection to the admission of several out-of-court statements attributed to Donald Ervin and Allison and made during the course of the events leading to defendants' arrest.[1] The prosecutor proffered these statements under Federal Rule of Evidence 801(d)(2)(E), which provides that "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not hearsay and can thus be offered for the truth of the matter asserted.

■ When determining whether a co-conspirator's statement is admissible over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that there was a conspiracy involving the declarant and the defendant against whom the statement is offered, and that the statement was made during the course of and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). Galloway concedes the existence of a conspiracy between Ervin, Campbell, and Allison to purchase cocaine. He also concedes that the challenged statements were made by members of the conspiracy during the course of and in furtherance of the conspiracy. Galloway's sole challenge is his claim that he was not a member of the conspiracy. Thus, he argues, out-of-court statements about the scope of the conspiracy were inadmissible and highly prejudicial.

■ Whether Galloway was a participant in the conspiracy is a preliminary question of fact that, under Federal Rule of Evidence 104(a), "shall be determined by the court." The evidentiary standard—unrelated to the substantive issues—is preponderance of the evidence. *Bourjaily*, 483 U.S. at 175, 107 S.Ct. at 2779. "There is little doubt that a co-conspirator's statements could themselves be probative of the

---

* Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. On appeal, Galloway has failed to identify which of the other co-conspirators' statements he complains about. He has never specified the hearsay statements to which he objects, why each statement was inadmissible, and how in each instance he was harmed by the evidence.

"We are therefore limited to searching the record for plain error and we find none." *United States v. Plotke*, 725 F.2d 1303, 1309 (11th Cir.1984); *United States v. Piatt*, 679 F.2d 1228, 1232 (8th Cir.1982) (rejecting challenge to admission of co-conspirator hearsay for failure to identify objectionable statements with specificity on appeal).

existence of a conspiracy and the participation of the defendant and the declarant in the conspiracy." *Id.* at 180, 107 S.Ct. at 2781. Thus, under *Bourjaily,* the court can look at the substance of the challenged co-conspirator testimony, as well as independent evidence, to determine whether or not Galloway was a participant in the conspiracy.

▪ At the close of the government's case, the district court held a *James* hearing and determined that Galloway was involved in the conspiracy.[2] A *James* determination will not be reversed unless clearly erroneous. *United States v. Perez,* 824 F.2d 1567, 1570 (11th Cir.1987). The record shows that (1) Galloway was present at the initial meeting of the co-conspirators, at the Classic's Nightclub, in which they discussed the drug deal; (2) Galloway gave Allison money to finance airfare to Miami for Allison, Wicker and Campbell; (3) Galloway flew to Miami with Ervin and shared a hotel room with Ervin while the details of the drug purchase were negotiated; (4) Campbell was arrested in possession of a note with Galloway's name and hotel number; (5) Campbell cleared arrangements for the Orlando purchase through Galloway and Ervin; (6) Galloway arranged for Mark Thompson to serve as a courier to drive him and the drugs to Washington, D.C.; (7) when the deal in Miami soured, Galloway arranged for his courier to drive Ervin and himself to Orlando where they would complete the drug purchase; and (8) Galloway, present when Johnson picked up the money, reputedly told Johnson that, "We have $60,000 for the deal. It's in the drawer." We see no error in the court's findings.

The co-conspirator testimony was properly admitted.

▪ Several of the statements Galloway challenges are actually statements made by him to witnesses who testified about these statements at trial. These statements were allowable as party admissions under Federal Rule of Evidence 801(d)(2)(A). "Any and all statements of an accused, so far as they are not excluded by the doctrine of confessions or by the privilege against self-incrimination, are usable against the accused and are not hearsay." *United States v. Clemons,* 676 F.2d 122, 123 (5th Cir. Unit B 1982)[3]. Admissibility of such statements depends on neither membership in a conspiracy, nor proof of an ongoing conspiracy. *Piatt,* 679 F.2d at 1233; *see also United States v. Archibold–Newball,* 554 F.2d 665, 676 (5th Cir. 1977)[4] (defendant's incriminating admissions, as related at trial by co-conspirators, were not hearsay).

### 2. Sufficiency of Evidence

▪ In reviewing a conviction for sufficiency of the evidence "[t]his court must view the evidence in the light most favorable to the government, ... and determine whether the jury could have found defendant guilty beyond a reasonable doubt." *United States v. Poole,* 878 F.2d 1389, 1391 (11th Cir.1989) (per curiam). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *Poole,* 878 F.2d at 1391. " 'In applying this standard

---

**2.** In this Circuit, the hearing at which the admissibility of co-conspirator hearsay is determined is called a *James* hearing, after *United States v. James,* 590 F.2d 575 (5th Cir.1979). Galloway claims he was entitled to a *James* hearing prior to admission of the offending statement. This is not true. "[I]f the district court concludes that a *James* hearing is not reasonably practical, it can admit the statements subject to the government later connecting them up" with sufficient evidence. *United States v. Barshov,* 733 F.2d 842, 850 (11th Cir.1984); *James,* 590 F.2d at 582. The government made its offer of proof; the court made a preliminary determination to allow the statements in based on this offer, subject to the government's ability to prove Gal-

loway's participation in the conspiracy. We find no error in the procedure adopted by the court.

**3.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of Unit B of the former Fifth Circuit.

**4.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

all reasonable inferences and credibility choices must be made in favor of the jury verdict, and that verdict must be sustained if there is substantial evidence to support it when the facts are viewed in the light most favorable to the government.' " *United States v. Pintado*, 715 F.2d 1501, 1503 (11th Cir.1983) (per curiam) (quoting *United States v. Davis*, 666 F.2d 195, 201 (5th Cir. Unit B 1982)). The court is not restricted to the evidence adduced during the government's case-in-chief. The court may examine all the evidence presented at trial.

■ The jury in this case had the opportunity to consider not only the evidence presented in the prosecution's case, but the testimony of defendants themselves. This is important. "Presented with two narratives, one tending to establish the defendants' guilt and another tending to establish innocence, the jury was entitled to choose the account offered by the government." *United States v. Goggin*, 853 F.2d 843, 846 (11th Cir.1988). " '[W]hen a defendant takes the stand in a criminal case ... the jury is free to disbelieve him and reject his explanation as a complete fabrication.' " *Goggin*, 853 F.2d at 846 (quoting *United States v. Cotton*, 770 F.2d 940, 945 (11th Cir.1985)). The jury may view defendant's false explanatory statement as substantive evidence proving guilt. *See United States v. Howard*, 895 F.2d 722, 724 (11th Cir.1990); *United States v. Bennett*, 848 F.2d 1134, 1139 (11th Cir.1988); *United States v. Elledge*, 723 F.2d 864 (11th Cir. 1984).

■ Both Galloway and Allison were convicted of aiding and abetting the attempted purchase of cocaine and of conspiracy to possess cocaine. To convict a defendant of conspiracy, the government must prove (1) that an agreement existed, (2) that defendants knew of its general purpose, and (3) that defendants voluntarily participated in the conspiracy. *Howard*, 895 F.2d at 724.

### a. Galloway

■ Galloway does not dispute the existence of an agreement to purchase drugs or his knowledge of the general purpose of that agreement. He argues that he did not participate in the conspiracy. The evidence is adequate, however, to show that Galloway played a central role in aiding and abetting the transaction. As set out in part 1 above, the facts show that throughout the conspiracy, Galloway acted knowingly and voluntarily. Galloway testified that he knew from the outset that Ervin was going to Miami to purchase drugs. Based on Galloway's testimony and other evidence, the jury could easily infer that Galloway had full knowledge of the conspiracy and could conclude that Galloway actively participated in the conspiracy.

Galloway elected to present an active defense, as is his right. Galloway claimed that he went to Miami to purchase an antique car and that Ervin asked to accompany him. Galloway admitted giving Allison money for the Miami airfare, but he claims that Ervin asked him to advance the money and then reimbursed him. Galloway said that he acted out of "friendship" and to save money when he shared a Miami hotel room with Ervin, drove Ervin to Orlando where the drug deal occurred, and waited in the hotel with Allison and Ervin for the co-conspirators to return with the drugs.

Galloway's testimony supports two hypotheses: (1) that Galloway was a central player in the drug conspiracy or (2) that he was "merely present". The jury, which was charged with making credibility determinations, convicted Galloway. Even on the paper record, Galloway's story is riddled with inconsistencies and makes little sense. The jury was entitled to believe the first hypothesis. There was sufficient evidence to convict Galloway.

### b. Allison

■ Allison claims he was convicted of the wrong drug conspiracy. Allison admits that he solicited Wicker as a cocaine source, that he flew to Miami with his colleagues to purchase cocaine, and that he participated in the conspiracy to purchase cocaine in Miami. But, he claims that when the drug purchase was set in Orlando, a new and separate conspiracy arose—a conspiracy involving new players and new

objectives, and in which he played no part. The government maintains that there was one over-arching conspiracy, begun in Washington, D.C. and completed in Orlando, whose objective was to purchase $60,000 worth of cocaine.

■ The question of single versus multiple conspiracies is one for the jury. *See United States v. Champion,* 813 F.2d 1154, 1165 (11th Cir.1987). In determining whether a reasonable trier of fact could have found a single conspiracy, the courts of this circuit have looked at three factors: "(1) whether a common goal existed, (2) the nature of the scheme, and (3) overlap of the participants." *Champion,* 813 F.2d at 1166 (quoting *United States v. Caporale,* 806 F.2d 1487, 1499–1500 (11th Cir.1986)). The jury was specifically instructed on multiple versus single conspiracies. After a review of the record, we conclude that it was possible for the jury to find one over-arching conspiracy.

Allison was in Miami to conclude a drug purchase. When Allison learned that his Miami cocaine source might be a DEA agent, Allison informed his co-conspirators of the need to find another source. Allison vouched for Johnson to the co-conspirators who did not previously know Johnson. In fact, Johnson had been tipped off by Allison's girlfriend that Allison was in Miami trying to pick up some cocaine and saw an opportunity to combine resources for a joint purchase.

Thus, all the *Champion* elements were satisfied. There was no break in time between the alleged conspiracies. There was a continuous course of conduct ending in Orlando when defendants attempted to purchase cocaine. From the evidence, a reasonable person could find that there was one conspiracy from which Allison never withdrew.

### 3. *Use of Peremptory Challenges*

■ Allison also challenges his conviction on the ground that the prosecutor's use of peremptory strikes to remove blacks from the jury violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). From a forty-person venire that included six blacks, the government used three out of a potential six peremptory challenges to strike black jurors. Three blacks were ultimately chosen for the jury—two jurors and one alternate. Both Allison and Galloway are black.

Allison argues (1) that *Batson* requires the trial court to find whether the defendant has established a prima facie case of discrimination in the selection of the jury and, if so, whether the prosecutor has given sufficient racially neutral reasons for his peremptory challenges; (2) that the second strike of a black man was sufficient to establish a prima facie case; (3) that the district court implicitly found that a prima facie case existed when the court asked the prosecutor to explain his strikes; and (4) that the explanations offered by the prosecutor were insufficient.

■ A defendant begins to build a prima facie case under *Batson* if he can "show that he is a member·of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723; *United States v. David,* 844 F.2d 767, 769 n. 2 (11th Cir.1988). A defendant "must [also] show that these facts and any other relevant circumstances *raise an inference* that the prosecutor used [the challenges] to exclude the veniremen from the petit jury on account of their race." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723 (emphasis added). Once a prima facie case has been established, "the burden shifts to the prosecutor to articulate a clear, reasonably specific and neutral explanation for challenging the black jurors." *David,* 844 F.2d at 769. The explanation, however, "need not rise to the level justifying the exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

The district court never expressly determined whether Allison had made a prima facie case of a *Batson* violation. After two black jurors were struck (and two white jurors struck), the judge told the prosecutor: "I can require that you make a statement ... at this time as to why you are

striking blacks." Although a third black juror was struck, the prosecutor may not have known the juror was black. At the close of jury selection, but before selection of alternates, the court asked the prosecutor to explain why he struck the blacks. The prosecutor denied that the strikes were racially motivated and said this:

> Well, I originally struck two blacks because I wanted other individuals that were behind them. I preferred them more on the jury. The government did not strike two other people who were black. I don't think there's any systematic exclusion of blacks.

When pressed for more detail, the prosecutor added this:

> There are various reasons, your honor. I can only allude to various factors which the courts go over. They include education, family, background, type of employment, various aspects, age. Those are all factors that I've included. I can't say one factor weighs over another one. There's a lot of times, your honor, that it's just a reaction to the situation.

The district court denied the *Batson* claim and allowed selection of alternates to proceed. The impaneled jury ultimately included three blacks—two regular jurors and one alternate juror. From the record it is impossible to know the basis of the district court's denial of the *Batson* objection.[5] The trial court might have believed that Allison failed to establish prima facie case or that the prosecutor presented adequate nondiscriminatory reasons for the discharge.

The Supreme Court in *Batson* contemplated that the determination of whether a prima facie case under *Batson* is established will ordinarily, if not always, be made in the first instance by the trial court. A remand to the trial court to make such a determination in this case, however, is un-

necessary, because we hold as a matter of law that Allison failed to present evidence sufficient to raise an inference of purposeful discrimination. *See United States v. Dennis*, 804 F.2d 1208, 1210 n. 22 (11th Cir.1986).

In *Dennis*, the government used three of its six peremptory challenges in selecting the jury; two of the potential jurors stricken from the venire were black. The government also challenged the selection of a potential alternate juror who was black. The final jury included two blacks and one black alternate. We concluded from these facts:

> It is thus obvious that the government did not attempt to exclude all blacks, or as many blacks as it could from the jury. Moreover, the unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks from the panel of potential jurors and alternates.... We thus conclude that all of the relevant facts and circumstances do not raise an inference of purposeful discrimination on the basis of race, and that appellants were not entitled to any inquiry into the prosecutor's reasons for exercising his peremptory challenges as he did.

*Dennis*, 804 F.2d at 1211. As in *Dennis*, the unchallenged presence of three blacks on the jury undercuts any inference of impermissible discrimination that might arise simply by the striking of other blacks.[6] We recognize that the seating of some blacks on the jury does not necessarily bar a finding of racial discrimination, but it is a significant fact.

■ While it is true that striking a black venireperson for racial reasons vio-

---

**5.** In a post-trial motion for new trial, Allison again raised a *Batson* claim. The court denied the motion without opinion.

**6.** *Cf. United States v. Horsley*, 864 F.2d 1543 (11th Cir.1989) (holding that *Batson* does not require pattern of peremptory strikes against minimum of three or four black veniremen; strike of *only* black member of venire might

make out prima facie case); *United States v. David*, 844 F.2d 767 (11th Cir.1988) (recognizing appellant's failure to make out prima facie case—where one black juror and one black alternate were chosen for final jury—as alternate basis for district court's opinion, but affirming on basis trial court could properly say government had rebutted prima facie case).

lates the Constitution, it is not true that all peremptory strikes of black venirepersons are for racial reasons. In making out a prima facie case, "the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal." *United States v. Young–Bey*, 893 F.2d 178, 179 (8th Cir.1990). *See also United States v. Dawn*, 897 F.2d 1444 (8th Cir.1990) ("numbers alone are not sufficient to establish or negate a prima facie case"); *United States v. Moore*, 895 F.2d 484, 485–86 (8th Cir.1990) (same); *United States v. Lewis*, 892 F.2d 735, 736 (8th Cir.1989) (same). "[T]he defendant must identify facts and circumstances that support the inference of discrimination, such as a pattern of discriminatory strikes, the prosecutor's statements during voir dire suggesting discriminatory purpose, or the fact that white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons." *Young–Bey*, 893 F.2d at 180 (citing *Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1722–23); *accord Dennis*, 804 F.2d at 1210.

Allison has pointed to nothing that strongly suggests racial motivation was the basis for the strikes used.[7] Fifteen percent of the venire for this case were black.[8] The percentage of blacks on the jury (including alternates) was twenty-one percent. The prosecutor struck three black jurors; he also struck two white jurors. The prosecutor preserved three black jurors, even though he had enough peremptory challenges to strike all the black jurors. Under such circumstances, we reject Allison's *Batson* claim.[9]

AFFIRMED.

---

**7.** At trial, Allison did not argue (and has not said he was barred from arguing to the district court) that specific white jurors who were accepted for the jury had basically the same backgrounds, educations, and other acquired attributes as one or more of the three black jurors who were struck from the jury; and, even on appeal, Allison does not make a specific comparison of similarities between black persons that were rejected and white persons accepted for the jury.

**HATCHETT, Circuit Judge, dissenting:**

I dissent. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), holds that a prosecutor's use of a peremptory challenge to remove even one African–American juror from a jury due to racial considerations is unconstitutional. "[T]he command of *Batson* is to eliminate, not merely to minimize, racial discrimination in jury selection." *United States v. David*, 803 F.2d 1567, 1571 (11th Cir.1986). When a prosecutor's strike of an African–American juror is objected to and the district court finds a prima facie case of discrimination, the district court is required to make inquiry of the prosecutor to determine whether the strike is based upon racial or racially neutral grounds. In this case, the defendant objected to the strikes, and the district court properly required an explanation. The district court improperly failed to rule on whether Allison established a prima facie case and improperly found that the prosecutor's stated reasons were sufficient. The majority misapplies the law as pronounced by the Supreme Court and this circuit. Allison satisfied the *Batson* test for a prima facie case of discrimination. In addition, the prosecutor's articulated reasons, quoted in the majority opinion, are the kind of nebulous explanations which *Batson* rejects.

Allison demonstrated that he satisfied the first prong of his *Batson* claim by showing "that he is a member of a cognizable racial group ... and that the prosecutor ... exercised peremptory challenges to remove from the venire members of [Allison's] race." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (citations omitted). Under the second prong of *Batson*, Allison was "entitled to rely on the fact, as to which there can be no dispute, that peremptory chal-

---

**8.** If we define the juror pool to be the impaneled jury (including alternates) plus the jurors who were peremptorily struck, the percent of blacks in the pool was twenty-one percent.

**9.** Judge Bright would add that the prosecutor gave an explanation which the trial judge impliedly deemed satisfactory and that the whole record, including the prosecutor's explanation, indicates the absence of racial animus.

lenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)). Allison is permitted to rely on this second prong to meet the third prong of the *Batson* test, which requires demonstration of an inference that the prosecutor used the peremptory challenges in a discriminatory manner. "[T]he defendant must show that these facts [demonstrated under the first and second prongs] and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723. In essence, the second prong collapses into the third as a means of demonstrating the inference of discrimination.

The majority holds that Allison failed to establish a prima facie case, in part, because he did not point to "other relevant circumstances" which would support the inference of a discriminatory motivation for the strikes. In fact, Allison alleged that several of the white jurors had the same backgrounds, education, and other attributes as the three challenged African–American venire persons. *See United States v. Young-Bey*, 893 F.2d 178, 180 (8th Cir. 1990) (circumstance supporting the inference of discrimination includes the fact that "white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons."). Allison also alleged that discriminatory intent may be inferred from (1) the percentage of prosecutorial peremptory challenges used to strike African–American members of the venire, (2) the pattern of striking African–American venire members absent articulable and particular reasons, and (3) the prosecutor's general assertion that the strikes were not racially motivated. I would hold that Allison established the inference of discrimination required under the third prong of *Batson*.

The majority supports its conclusion by discussing the number of African–American jurors seated, the percentage of African–Americans on the panel, the number of

white jurors struck, and the number of unused peremptory challenges. Although these factors have some relevance, they are not controlling factors under our law.

The majority's sole case support for the outcome in this case is *United States v. Dennis*, 804 F.2d 1208 (11th Cir.1986). In *Dennis*, the court held that the appellant failed to make out a prima facie case of purposeful discrimination because of similar circumstances, including the presence of two African–Americans on the jury and the government's failure to use all of its peremptory challenges. The weight of case law in the Supreme Court and in this circuit runs contrary to such a conclusion, as demonstrated by the cases cited in the majority's opinion. "[U]nder *Batson*, the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown." *United States v. David*, 803 F.2d at 1571. It should be noted that the court in *Dennis* did not cite any precedent for its conclusion that the presence of African–Americans on the jury undercut any inference of discrimination. Thus, to the extent that *Dennis* supports affirmance in this case, I would suggest that *Dennis* should be overruled in banc.

The district court arguably found that Allison established a prima facie case because it expressly requested the prosecutor to state his reasons for challenging African–American jurors. At that point, the burden shifted to the prosecutor to "articulate a clear, reasonably specific and neutral explanation for challenging the black jurors." *United States v. David*, 844 F.2d 767, 769 (11th Cir.1988). The prosecutor could not rebut the prima facie case by merely denying that he had a discriminatory motive or by asserting generally that he typically relies on neutral reasons for challenging jurors. "The prosecutor ... must articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. The prosecutor's general denial of discriminatory intent in this case is not specific or

particularized enough to rebut Allison's prima face case. Therefore, I would reverse and remand this case for a new trial.